**Philip BOOTHE, Plaintiff,**

v.

**TRW CREDIT DATA and Fidelifacts/Metropolitan, N.Y., Inc., Defendants.**

**No. 80 Civ. 5073 (CBM).**

United States District Court, S.D. New York.

Oct. 21, 1982.*

*\* Final Copy of Findings of Fact and Conclusions   of Law Filed September 20, 1982.*

Lewis G.P. Ashton, Jamaica, N.Y., for plaintiff.

Wexler & Burkhart, P.C. by Stephen B. Wexler, David Hirschberg, New York City, for defendant Fidelifacts/Metropolitan, N.Y., Inc.

Townley & Updike by Jerome P. Coleman, Walter F. Timpone, New York City, for defendant TRW Credit Data.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, Chief Judge.

Plaintiff, Philip Boothe, brought this action against TRW Credit Data (TRW) and Fidelifacts/Metropolitan, N.Y., Inc. (Fidelifacts) charging them with having violated the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, through the dissemination of a credit report about plaintiff. The following are the court's Findings of Fact and Conclusions of Law upon the trial of this action, which took place on June 2–4 and June 9, 1982.

*Findings of Fact*

Plaintiff, Philip Boothe, was a mail importer of various items for resale (Tr. 59–60). Defendant TRW is a credit reporting agency which receives, assembles, stores and reports consumer credit information to its subscribers (Tr. 339). Defendant Fidelifacts is an investigative agency which is a contractual subscriber of TRW (Pre-Trial Order (PTO) ¶ 11). Plaintiff operated his business under the name Quality Mail Order House (PTO p. 2 ¶ 1). Plaintiff had over 30 years of experience in various types of foreign trade at the time of the events at issue (Tr. 64). In September, 1979, plaintiff attempted to enter the liquor business (Tr. 61). To do so, he wrote to a Dr. Paul Singer in September, 1979, receiving in response a list of whiskey importers. On that list was the name of Haecky A.G. of Switzerland (Haecky) (Tr. 62).

After receiving the list from Dr. Singer, plaintiff wrote to Haecky (Tr. 62–63; Plaintiff's Exh. 2). Haecky then asked plaintiff to make offers on two liquors (Tr. 64–65; Plaintiff's Exh. 3). After receiving a $40 money order from Haecky, plaintiff sent Haecky two "sample" bottles of whiskey (Tr. 66).

Haecky is an overseas distributor of Johnny Walker Red Label Scotch, obtaining the liquor directly from the producer of the scotch, Distillers, Ltd., (PTO p. 3, ¶ 6). Haecky notified Distillers of plaintiff's offer to sell its liquor (PTO p. 3, ¶ 7).

Distillers thereupon retained Edward Askew, a private investigator located in London, to investigate Quality Mail Order House to determine if the whiskey plaintiff was offering was contraband or counterfeit (PTO p. 3, ¶ 8). Mr. Askew, in turn, contacted Fidelifacts in New York (Tr. 288, 300). Mr. Berbit, a vice president of Fidelifacts during the period in question, testified that Mr. Askew told him that Mr. Boothe had made an offer to sell whiskeys to the "sole distributor of Johnny Walker Black products in Switzerland" (Tr. 293). Mr. Berbit knew that Distillers had encountered problems with counterfeit whiskey shortly before Mr. Boothe's offer (Tr. 304–05).

Fidelifacts is an investigative organization primarily involved in completing reports on job applicants (Tr. 303). Fidelifacts has advertised itself as a credit reporting agency, but it primarily obtains reports from credit bureaus and furnishes them, or reports which Fidelifacts completes, to entities that request them (Tr. 300, 303).

Mr. Benjamin Molina, a window clerk at the Springfield Gardens Post Office, testified that in November, 1979 a man with the first name of Don and a last name that starts with a "G" came in and sought the address of plaintiff (Tr. 245–46). This man "seemed very upset at the time, so [Mr. Molina] asked him why he was so upset" (Tr. 247). "Don G" replied that plaintiff somehow had cheated him out of money in a liquor deal and, in Mr. Molina's words, "he asked me at that time if I had any more complaints on him or people trying to locate him and all that" (Tr. 247). The court finds Mr. Molina, a witness uninterested in the outcome of this case, to be wholly credible.

Mr. Berbit testified that as a result of the telephone call from Mr. Askew, he ordered plaintiff's credit report (Tr. 289). In order to obtain plaintiff's credit report, he had to first obtain plaintiff's address from his post office box (Tr. 291). To obtain that address, Mr. Berbit dispatched Mr. Donald Gerogetti, an employee or agent of Fidelifacts, to the post office (Tr. 289, 334–35). Mr. Berbit testified that he did not tell Mr. Gerogetti anything except that he wanted plaintiff's business address (Tr. 335).

The court finds that Mr. Gerogetti was the person Mr. Molina testified came to the post office. The court further finds that Mr. Gerogetti attempted to obtain information about complaints about plaintiff and falsely portrayed himself as a liquor customer of plaintiff. It was undoubtedly not coincidence that Mr. Gerogetti chose the liquor business as the basis of his inquiry. He obviously knew that plaintiff was involved in that business, and that he was suspected by a customer of Fidelifacts of some illicit liquor activity. Mr. Gerogetti learned about plaintiff's involvement in the liquor business from his supervisor, Mr. Berbit. Mr. Berbit's assertion that he told Mr. Gerogetti nothing about why he wanted information on Mr. Boothe is incredible.

Mr. Berbit's oft-stated assertion (Tr. 293–95, 304–07) that he was not aware that the *only* reason Mr. Askew asked about plaintiff was because he suspected plaintiff of illicit liquor activity is equally incredible. Mr. Berbit knew that Haecky, as the sole distributor of Distillers' liquor in Switzerland, was not likely to purchase liquor by mail from an American retailer or wholesaler. Thus, he knew that the need for the credit report stemmed largely from the investigation taking place. Fidelifacts had only one intention when it obtained plaintiff's credit report. That intention was to aid in an investigation which would attempt to stop a suspected illicit seller of Distillers' goods. There was no intention on the part of Fidelifacts to use plaintiff's report for the purpose of credit, licensing, employment or insurance.

Once Fidelifacts had the information it needed from the Springfield Post Office, it ordered plaintiff's credit report through a terminal in its office (Tr. 289, 343–44, 348–51). The only information (in addition to that needed to identify Fidelifacts) which

was put into the terminal to obtain plaintiff's credit report was plaintiff's name and home address (Tr. 291, 325). Fidelifacts did not have to enter any information denominating why it wanted the report, although TRW could require its subscribers to do so (Tr. 360, 403). TRW receives 100,000 requests for reports each day (Tr. 361). Speed is very important to TRW subscribers (Tr. 354).

Fidelifacts, as a subscriber of TRW's services, has entered into a subscriber service agreement with TRW (TRW Exh. B). TRW is a credit reporting agency which stores and reports consumer credit information (Tr. 339). The subscriber service agreement provides in part that Fidelifacts "certifies and agrees that it will request and use credit data received from TRW solely in connection with a credit transaction involving the consumer as to whom a credit profile is sought." (TRW Exh. B, ¶ 8). No other evidence was offered as to steps taken by TRW to ensure that Fidelifacts would not request and automatically obtain reports for whatever reason it so chose. In fact, the evidence presented demonstrates that there is no way for TRW to find out if Fidelifacts requests a report for an improper purpose, unless the latter chooses to tell it so, as there is no way to input on the teletype the purpose for the request (Tr. 352). This is true despite the fact that the computer program of TRW could be written to require subscribers to input the reason for the request (Tr. 360). In the instant case, Fidelifacts obtained plaintiff's report via teleprinter (Tr. 344–45 and TRW Exh. U–1). Fidelifacts did not inform TRW, prior to its receipt of plaintiff's report, that the reason it wanted to obtain the report was to aid in an investigation of plaintiff as a possible counterfeiter (Tr. 355–56).

After his report was released to Fidelifacts, plaintiff learned of Fidelifacts' inquiry (Tr. 83; TRW Exh. G–2). Plaintiff then asked for information regarding Fidelifacts. Eventually, plaintiff informed TRW that he knew nothing of Fidelifacts and asked how it was that the latter came to ask about him (TRW Exh. I). TRW agreed to investigate the Fidelifacts inquiry (TRW Exh. J). TRW then called Fidelifacts (Tr. 375–78; TRW Exhs. K, L). Fidelifacts told TRW that it had no record of having asked for Boothe's file and that TRW could delete its reference to Fidelifacts (Tr. 378–79, 399–400, 449; TRW Exh. L). At trial, Fidelifacts offered no explanation of why it did not acknowledge to TRW that it had requested and obtained plaintiff's report. The court finds that Fidelifacts' unexplained refusal to acknowledge its request to TRW, in conjunction with other circumstances previously described, is evidence of guilty knowledge on the part of the individuals in that organization.

The credit report received by Fidelifacts contained information about plaintiff, his wife, and various paid and unpaid accounts and tax liabilities (Tr. 383–84, 419–420; TRW Exh. M).

Plaintiff values his privacy rights very highly (Tr. 76). On the basis of the number of letters written to TRW by plaintiff, the vigor with which he has pursued the instant action, and his demeanor in court, the court finds that plaintiff was greatly distressed by the unauthorized release of his report by TRW to Fidelifacts and the invasion of his privacy.

Plaintiff suffered no financial or other business loss (PTO ¶ 13).

*Conclusions of Law*

The court concludes that the report made available by TRW to Fidelifacts was a consumer report as defined by 15 U.S.C. § 1681a. Consumer report is defined as:

any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes

authorized under section 1681b of this title.

An examination of the report issued to plaintiff upon his request (TRW Exh. M) leads the court to conclude that the information collected by TRW was "expected to be used or collected in whole or in part" for the credit purposes as listed above. The information in the TRW files included personal and credit information about plaintiff and his wife, and was listed under plaintiff's name rather than his business name. Thus, although TRW may have issued the report to Fidelifacts for reasons not relating to credit, the report is a consumer report. *See Boothe v. TRW Credit Data,* 523 F.Supp. 631, 634 (S.D.N.Y.1981).

*Purpose Of The Issuance Of The Report*

The credit report issued about plaintiff was neither requested or issued pursuant to a court order nor pursuant to plaintiff's instructions (15 U.S.C. §§ 1681b(1) and 1681b(2)). When so requested, a consumer reporting agency may furnish a consumer report "to a person which it has reason to believe" intends to use the information in connection with credit (§ 1681b(3)(A)), employment (§ 1681b(3)(B)), insurance (§ 1681b(3)(C)), licensing (§ 1681b(3)(D)), or a person who "has a legitimate business need for the information in connection with a business transaction involving the consumer," 15 U.S.C. § 1681b(3)(E).

■ The report issued about plaintiff was not issued for a credit, licensing, employment or insurance purpose. Thus, the only question for the court is whether the purpose for which it was obtained, to aid in the conduct of an investigation of a suspected counterfeiter, is a purpose included within the ambit of § 1681b(3)(E). Section 1681b(3)(E) "refers only to those transactions in which there is a 'consumer relationship' between the requesting party and the subject of the report or in which the subject was seeking some benefit mentioned in the Act (credit, insurance, employment licensing) from the requesting party." *Boothe v. TRW Credit Data,* 80 Civ. 5073 (S.D.N.Y. August 26, 1981), slip op. at 4. *See Hansen v. Morgan,* 582 F.2d 1214 (9th Cir.1978).

There was no such relationship between Mr. Boothe and Distillers or Fidelifacts at any time. In fact, there was no relationship whatsoever between plaintiff and Distillers; plaintiff sought nothing from Distillers. The court concludes that aiding in a private investigation of a suspected counterfeiter does not constitute a permissible purpose for acquiring a credit report of an individual pursuant to 15 U.S.C. § 1681b(3)(E). Thus, Fidelifacts requested and received plaintiff's credit report for an improper purpose.

*Liability of Fidelifacts*

■ The court now confronts the issue of whether Fidelifacts is to be held liable for obtaining plaintiff's report for an improper purpose.

In its contract with TRW, Fidelifacts certifies that it will only request those credit reports for use "in connection with a credit transaction involving the consumer as to whom a credit profile is sought" (*see* Findings of Fact). As TRW does not require its subscribers to inform it of the purpose for each individual request for a credit report, it relies solely upon that certification. Indeed, there is virtually no way for TRW to be informed about the purpose for the request for a report unless the subscriber wishes to so inform it. Fidelifacts did not so inform TRW. As noted, however, Fidelifacts did not seek plaintiff's credit report in connection with a credit transaction involving plaintiff. Thus, it acquired the report under false pretenses. *See Hansen v. Morgan,* 582 F.2d 1214.

15 U.S.C. § 1681q, the Act's criminal provision, makes subject to criminal penalties "[a]ny person who knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses." This provision "requires that users of consumer information refrain from obtaining such information from credit reporting agencies under false pretenses." *Hansen v. Morgan,* 582 F.2d at 1214, 1219 (9th Cir.1978). Section 1681q of the Act provides civil liability for "any consumer reporting agency or user of information

which willfully fails to comply with any requirement imposed under [the Act] with respect to any consumer." This provision, among other things, "authorizes a civil remedy against a user of a credit report who fails to comply with the act's criminal provision." *Hansen v. Morgan,* 582 F.2d at 1216; *see Rice v. Montgomery Ward & Co.,* 450 F.Supp. 668 (M.D.N.C.1978). In short, a user who acquires the credit report under false pretenses is liable to the consumer as well as subject to potential criminal penalties. *Hansen v. Morgan,* 582 F.2d at 1216. The term "user" refers not only to the ultimate destination of a credit report but also encompasses the person who acquires it for another. *Hansen v. Morgan,* 582 F.2d 1214. Thus, Fidelifacts is properly considered a user, and is civilly liable to plaintiff because it acquired his credit report under false pretenses.

"Obtaining a consumer report in violation of the terms of the statute without disclosing the immpermissible (sic) purpose for which the report is desired can constitute obtaining consumer information under false pretenses." *Hansen v. Morgan,* 582 F.2d at 1219–20. Fidelifacts acquired plaintiff's report for an impermissible purpose. It did not disclose that impermissible purpose to TRW. As Fidelifacts certified that it would only request reports in connection with a credit transaction involving the consumer and there was no such credit transaction in the instant case, the court concludes that Fidelifacts obtained plaintiff's report under false pretenses. As noted, that is prohibited by § 1681q, and, if willful, may be penalized under § 1681n.

The court concludes that Fidelifacts' violation of 1681q was willful, as Mr. Berbit knew of the purpose for acquiring the report, and knew it had nothing to do with granting credit to plaintiff, yet obtained the report from TRW without disclosing his purpose to TRW.

### Liability of TRW

■ Fidelifacts certified to TRW that it would only request reports for legitimate credit purposes. Given the high volume of credit requests that TRW must respond to each day, and the importance of a speedy response, the court concludes that it would be impractical to require TRW to verify the purpose for each credit report. By requiring its subscribers to certify the purpose for reports in advance, TRW reasonably strikes a balance between the conflicting goals of protecting the privacy rights of consumers and promoting an efficient credit economy. At least in the context of this case, where Fidelifacts is primarily in the business of requesting reports for proper purposes (employment) and there was no showing that TRW knew of the improper purpose for the report issued as to plaintiff, the court concludes that TRW's release of plaintiff's report was not in violation of the Act. In short, Fidelifacts' primary business purpose and its certification to TRW constituted sufficient "reason to believe" on the part of TRW that Fidelifacts had a legitimate business need for the report requested.

### Damages

15 U.S.C. § 1681n provides as follows:

Any consumer reporting agency or user of information which willfully fails to comply with any requirement imposed under this sub-chapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

(1) any actual damages sustained by the consumer as a result of the failure;

(2) such amount of punitive damages as the court may allow; and

(3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

■ The release of the credit report in question violated plaintiff's right to privacy, one of the principal rights the Act was enacted to protect. Plaintiff, as might be expected of any individual, values his privacy rights highly. There were no actual damages alleged or proven.

Due to the wilful nature of Fidelifacts' actions and the need to prevent future similar abuses on their part, the court assesses

punitive damages in the amount of $15,000 against it. These damages are predicated upon the wilful nature of defendant's conduct, in accordance with the statutory language embodied within 15 U.S.C. § 1681n. Malice is not a requirement of punitive damages under the Act. 15 U.S.C. § 1681n; *Nitti v. Credit Bureau of Rochester,* 375 N.Y.S.2d 817, 84 Misc.2d 277 (Sup.Ct.1975).

The court also awards costs to plaintiff, including an attorney's fee based upon plaintiff's attorney's time spent in court, time spent out of court on this case, and the skill demonstrated, as well as the novelty of the issues involved and the difficulty of plaintiff's case. Such an award of attorney's fees will be made on the presentation of an affidavit by plaintiff's counsel as to his time spent in and out of court on this case.

There has been no showing of a need for a permanent injunction, and thus plaintiff's request for such is denied.