[No. B024573. Second Dist., Div. Two. Nov. 9, 1987.]

JAMES W. HIEMSTRA, Plaintiff and Appellant, v. TRW, INC., Defendant and Respondent.

**COUNSEL**

Duwain H. Herring for Plaintiff and Appellant.

Cutler & Cutler, Nancy L. Dassoff and Harry I. Jacobs for Defendants and Respondents.

**OPINION**

**FUKUTO, J.**—James Hiemstra appeals the trial court's grant of summary judgment in favor of TRW, Inc. (TRW).

The facts are not disputed.

TRW, a consumer credit reporting agency, offers a computerized service to subscribers who provide to TRW certain credit information concerning consumers, which TRW evaluates and stores. Upon request of a subscriber, TRW disseminates a credit profile which contains private financial information. TRW receives, on an average, 200,000 such requests each day.

Crocker Bank has been a contractual subscriber of TRW since 1973. At the time Crocker became a subscriber, it entered into a service agreement with TRW which provides, in pertinent part: "8. SUBSCRIBER USE LIMITATIONS. Subscriber hereby certifies and agrees that it will request and use credit data received from TRW solely in connection with a credit transaction involving the consumer as to whom a credit profile is sought. . . .

"9. TRW USE LIMITATIONS. In furnishing to its other subscribers and customers credit data emanating from Subscriber, TRW will exercise its best efforts to confine the ultimate use of such data to credit transactions, or non-credit business transactions as to which applicable federal or state law authorizes the furnishing of consumer credit data. . . ."

In 1984, Margaret Hiemstra, James's wife, applied for an extension of credit with Crocker. In connection with the application, she provided husband James's name, address and social security number. Thereafter, Crocker requested and received from TRW, credit reports on both Margaret and James. Following TRW's release of the credit reports, Crocker advised Margaret in writing that the extension of credit applied for had been denied.

■ James, upon being advised that TRW had released a credit report concerning him, joined with Margaret in filing a civil action. Only the fifth and sixth causes of action are directed against TRW.[1] In the fifth cause of action, James alleges that TRW's dissemination of his credit report to Crocker, under the facts of this case, was a violation of sections 1785.11 and 1785.14, subd. (a) of the California Consumer Credit Reporting Agencies Act. (Civ. Code., § 1785.11 et seq.)[2] He does not allege anything in the report is false. In the sixth cause of action, James alleges that TRW and Crocker are "continually engaged in the practice of soliciting, collecting, compiling, recording, and publishing among themselves and to large numbers of other persons, written information concerning [James] and his personal affairs and conditions, including information relating to his past and present purported debts and obligations, mode of living, buying habits, and other personal information; . . ." and that these acts, which were done without his "knowledge, consent, or authorization," constitute an invasion of privacy and a violation of his rights under the California Constitution, article I, section 1. He seeks a permanent injunction enjoining TRW and Crocker from doing or causing to be done the foregoing acts unless they

---

[1] The first four causes of action are brought by Margaret against Crocker in connection with her application to, and denial by, Crocker of an extension of credit. Crocker is also a named defendant with respect to the sixth cause of action for invasion of privacy. However, Crocker was not a party to the summary judgment and is not a party to this appeal.

[2] All subsequent statutory references are to the Civil Code.

first obtain James's prior written consent or a valid order or other process issuing from a court of competent jurisdiction specifically directing or authorizing such acts.

The trial court, in granting TRW's motion for summary judgment, concluded that TRW ". . . has established it violated no statutes or violated [James's] right to privacy."

The California Consumer Credit Reporting Agencies Act delineates the obligations of consumer reporting agencies regarding accuracy and disclosure of credit information. Its declared purpose is to "require that consumer credit reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, . . . in a manner which is fair and equitable to the customer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. . . ." (§ 1785.1, subd. (d).) To accomplish this goal, the Legislature enacted sections 1785.11 and 1785.14.

Section 1785.11, subdivision (d), provides that a consumer credit report can only be furnished by an agency "[t]o a person which it has reason to believe: [¶] (1) Intends to use the information in connection with a credit transaction, . . . involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; . . . ." Section 1785.14, subdivision (a), provides that "[n]o consumer credit reporting agency may furnish a consumer credit report to any person unless it has reasonable grounds for believing that the consumer credit report will be used by such person for purposes listed in Section 1785.11."

In order to ensure that the furnishing of consumer credit reports will be limited to the purposes listed under section 1785.11, agencies are statutorily mandated to maintain "reasonable procedures" which include requiring prospective users of the information to identify themselves, certify the purposes for which the information is sought, certify that the information will be used for no other purposes, and, thereafter, to keep a record of the purposes, as stated by the user. (§ 1785.11, subd. (a).)[3]

---

[3] An agency is also required to make a "reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report." (§ 1785.14, subd. (a).) James attempts to create a distinction between "prospective users" and "new prospective users." He contends that the statute imposes a stricter burden upon an agency with regard to prospective users, with whom the agency has had prior dealings, than upon new prospective users, with whom a consumer credit reporting agency has had no prior dealings. James offers no authority for such an interpretation, nor does the plain language of the statute support such a position. The statute merely requires an agency, such as TRW, to conduct a reasonable investigation of each "new prospective user"

James contends that TRW, in order to fully comply with sections 1785.11 and 1785.14, subdivision (a), must obtain from its subscriber, each time a request is made, a certification indicating that the request for a credit report involves the extension of credit to, or review or collection of an account of, the particular consumer about whom the request is being made. James asserts that TRW's procedures, which consist of obtaining from subscribers such as Crocker, a general agreement certifying that it will "request and use credit data received from TRW solely in connection with a credit transaction involving the consumer as to whom the credit profile is sought," and thereafter retaining in its records a copy of the certification, does not, as a matter of law, meet the statutory dictates of sections 1785.11 and 1785.14, subdivision (a).

We find persuasive the case of *Boothe* v. *TRW Credit Data* (S.D.N.Y. 1982) 557 F.Supp. 66. In that case, a consumer, alleging a violation of the Federal Fair Credit Reporting Act (FFCRA), sued TRW and Fidelifacts, a subscriber, after Fidelifacts requested and received a credit report from TRW which Fidelifacts then used for an unauthorized purpose. The court, confronted with the same general subscriber certification at issue in the instant case, stated, "Fidelifacts certified to TRW that it would only request reports for legitimate credit purposes. Given the high volume of credit requests that TRW must respond to each day, and the importance of a speedy response, the court concludes that it would be impractical to require TRW to verify the purpose for each credit report. By requiring its subscribers to certify the purpose for reports in advance, TRW reasonably strikes a balance between the conflicting goals of protecting the privacy rights of consumers and promoting an efficient credit economy. . . . In short, Fidelifacts' primary business purpose and its certification to TRW constituted sufficient 'reason to believe' on the part of TRW that Fidelifacts had a legitimate business need for the report requested." (*Boothe* v. *TRW Credit Data, supra,* 557 F.Supp. at p. 71.)

James contends it would be inappropriate to adopt the reasoning and rationale of *Boothe* since the obligations imposed by the FFCRA at issue in *Boothe,* are significantly different than those mandated by the California Consumer Credit Reporting Agencies Act. The FFCRA, enacted in 1971, superseded the credit reporting act then in existence in California.

---

prior to entering into a subscriber agreement with such an individual or entity. Thereafter, the "new prospective user" becomes a "prospective user," an individual or entity who has been the subject of an investigation by the reporting agency and has now submitted a request for a credit report. "If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' [Citations.]" (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].)

Thereafter, the Federal Trade Commission declared the FFCRA of 1971 inadequate in certain areas, prompting California to enact the California Consumer Credit Reporting Agencies Act. However, while the California Consumer Credit Reporting Agencies Act does provide consumers with more stringent safeguards than does the FFCRA with respect to credit reporting, the differences noted by James do not compel reversal in the instant case.

James notes that the state statute requires an agency to keep records of the purposes for which the credit reports are used, but that the federal statute imposes no such requirement. While we acknowledge this difference, we are of the opinion that TRW has met the recordkeeping requirements mandated by statute by retaining, on file, available for inspection by the consumer, a copy of the one-time certification obtained by TRW from Crocker at the time Crocker became a subscriber of TRW's services. We see no benefit to the consumer in requiring a subscriber to submit to TRW, with each request for a credit report, paperwork certifying that the information will be used for a legitimate business purpose. Such a certification would, no doubt, contain the same language as that contained within the general certification provided by Crocker at the time it became a subscriber of TRW's services. Such useless duplication and retention of paperwork does nothing to promote the statute's dual goals of protecting the privacy rights of consumers while promoting an efficient credit economy.

James contends that the federal statute, which provides that "[n]o consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a [proper] purpose," places the burden on the consumer to prove the agency lacked reasonable grounds for believing the report would be used for an improper purpose, while the state statute, which provides that "[n]o consumer credit reporting agency may furnish a consumer credit report to any person unless it has reasonable grounds for believing that the consumer credit report will be used by such person for [proper] purposes," places the burden on the agency to prove that it had reasonable grounds for believing the report would be used for proper purposes. (§ 1785.14, subd. (a).)

Assuming that James is correct in his contention regarding TRW's burden of proof, we conclude that TRW's practice of requiring Crocker to certify the purpose for reports in advance, and thereafter retaining, on file, a copy of the one-time general certification, meets the burden of proving that it had reasonable grounds for believing the report would be used for proper purposes. Thus, the dissemination of James's credit report, under the facts of this case, was not a violation of the California Consumer Credit Reporting Agencies Act.

■ With respect to the cause of action for invasion of privacy, as alleged within the sixth cause of action, such an action is barred by section 1785.32. Under that section, an action for invasion of privacy may not be brought by a consumer against a credit reporting agency "except as to false information furnished with malice or willful intent to injure such consumer."[4]

California, in enacting section 1785.32, has chosen to limit the right of a consumer to assert a common law cause of action for invasion of privacy to those circumstances where the reporting agency, with malice, collects, stores or disseminates false information concerning the consumer. In the instant case, James does not allege that anything contained within the report was false.

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.

---

[4]Section 1785.32 provides, in pertinent part: ". . . [N]o consumer may bring any action or proceeding in the nature of defamation, invasion of privacy or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to Sections 1785.10, 1785.15 or 1785.20 of this title, except as to false information furnished with malice or willful intent to injure such consumer."