Jerrod HARRIS, Plaintiff,

v.

DATABASE MANAGEMENT
& MARKETING, INC.,
et al., Defendants.

Civil No. JFM 06–2017.

United States District Court,
D. Maryland.

April 23, 2009.

Scott C. Borison, Legg Law Firm LLC, Frederick, MD, Jane Santoni, Williams and Santoni LLP, Towson, MD, Peter S. Lubin, Ditommaso Lubin PC, Oakbrook Terrace, IL, for Plaintiff.

Jon R. Fetterolf, Laurie S. Fulton, Williams and Connolly LLP, Washington, DC, Arthur F. Radke, Dykema Gosset PLLC, Chicago, IL, for Defendants.

## MEMORANDUM

J. FREDERICK MOTZ, District Judge.

Seeking to represent a class of similarly situated persons, Jerrod Harris ("Harris" or "Plaintiff") filed a lawsuit against ChoicePoint Services, Inc. ("ChoicePoint") alleging violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*[1] This claim arises out of the mass mailing of a flier that claimed to offer Harris, and other putative class members, a pre-approved line of credit for the purchase of an automobile from Foreign Motors Suzuki, a car dealership in Maryland.

On September 30, 2008, I denied ChoicePoint's statute of limitations-based summary judgment motion and administratively closed Plaintiff's motion for class certification, subject to being reopened after consideration of the remaining motions for summary judgment. *Harris v. DMMI Promotions, Inc.,* Civil No. JFM–06–2017, 2008 U.S. Dist. LEXIS 80767, at *4 (D.Md. Sept. 30, 2008) (unpublished). I also denied without prejudice Plaintiff's motion for partial summary judgment and ChoicePoint's motion for summary judgment. A further factual record has now been established, and the parties have renewed their motions for summary judgment. As the parties have now fully briefed the motions, no hearing is necessary. *See* Local Rule 105.6.

For the reasons stated below, Defendant ChoicePoint's renewed motion for summary judgment will be granted, and Plaintiff's renewed motion for partial summary judgment will be denied.[2]

## I.

In May 2005, Harris received a flier that purported to offer him a pre-approved line of credit to purchase an automobile from Foreign Motors Suzuki. (Pl.'s Response in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") Ex. F; *see also* Third Am. Compl. ¶ 12; Def.'s Mem. Ex. 20, Harris Dep. 38:14–20, April 24, 2008.) The flier also stated that the recipient is the winner of "one of the following" prizes: a Sony Flatscreen TV, $100 in cash, a Sea–Doo Watercraft, a $1,000 shopping spree, or $4,000 in cash. (Pl.'s Opp'n Ex. F.) The flier stated that it had been issued by "Auto Credit of America." (*Id.*) However, Auto Credit of America is a fictitious entity. (Third Am. Compl. ¶ 6; Pl.'s Opp'n Ex. I, Teets Dep. 246:12–247:16, 263:1–6, June 24, 2008.)

The following language is found in small print at the bottom of the flier:

> Your new vehicle payment cannot exceed 20% of your gross monthly income; vehicle payment totaled with your current monthly payments must not exceed 50% of your gross income. Must be at least 18 years of age. If you accept this offer, we may not extend credit to you if, after you respond, we determine that you do not continue to meet the criteria used for this pre-approved offer. Lender assumes no responsibility for incorrect information supplied by various credit reporting agencies.... Credit severity may affect down payment. Bankruptcies must be discharged. *If in compliance with provisions listed above, you are guaranteed to receive a loan for the purchase of a 2003 or newer vehicle*

---

1. Harris has stipulated to dismissal with prejudice of his claims against two other defendants, Database Management and Marketing, Inc. ("DMMI") and Name Seeker, Inc. ("NameSeeker"). *See* Docket Number 142 (dismissing claims against NameSeeker); Docket Number 145 (dismissing claims against DMMI).

2. ChoicePoint has also filed a motion for leave to file a surreply in opposition to Plaintiff's motion for partial summary judgment. This motion is denied as moot. Neither the surreply nor the Plaintiff's affidavits it contests as inadmissible are considered herein and are not relevant to the analysis of Plaintiff's Section 1681b claim.

*from Direct Lending Source.* Notice: We used information in a pre-qualifying report from a credit-reporting agency in connection with this firm offer of credit. You have the right to prohibit the use of this information contained in your credit file with any credit-reporting agency for all future credit transactions not initiated by you.

(Pl.'s Opp'n Ex. F (emphasis added).) Direct Lending Source, the only lender identified in the flier, is a trade name of Virtual Lending Source, LLC. (Pl.'s Opp'n Ex. L, Gluckman Aff.) However, according to Plaintiff, Virtual Lending Source, had no involvement with this flier's production or distribution.[3] (*Id.*)

In an effort to pursue these offers, Harris went to Foreign Motors Suzuki and presented the flier. (Defs.'[4] Mem. Supp. Mot. for Summ. J. [Dkt. 105] Ex. 5 at 5.) Harris was initially told that he would be able to purchase a vehicle. (*Id.*) He filled out an application and was in fact permitted to leave the dealership with a new Suzuki Verona two days later, but was made to return the vehicle shortly thereafter without explanation from the dealership. (*Id.* 5–6.)

In response to these events, Harris filed suit against Foreign Motors Suzuki in the District Court for Baltimore City for replevin, trover, conversion, breach of contract, deceptive trade practices, unjust enrichment, violation of a retail sales contract statute, and fraud; this suit was unsuccessful. (*See* Defs.' Mot. for Summ. J. on Statute of Limitations Grounds Ex. 5.) Harris then initiated the instant litigation,

alleging that defendants violated the FCRA when they improperly accessed his credit information without a permissible purpose, and that they failed to institute required reasonable procedures meant to prevent such improper accessing of credit reports. (*See generally* Third Am. Compl.)

Discovery has revealed that ChoicePoint entered into a Prescreening Agency Agreement with Experian Information Solutions, Inc. ("Experian") in July 2001. (Pl.'s Opp'n Ex. A.) Under the agreement, ChoicePoint, as Experian's "Agent," could only sell data from consumer reports maintained by Experian to a customer, such as NameSeeker, if the customer entered into a contractual agreement directly with Experian (a "Prescreening Services Agreement" or "PSA"). (*Id.* ¶ 3.a.ii.) The agreement also states that ChoicePoint "shall verify and confirm" that a customer "is a valid commercial enterprise with a true business identity" that "will use the Prescreening Services only in connection with the provision of a firm offer of credit or insurance...." (*Id.* ¶ 3.a.iv.) ChoicePoint agreed to "monitor the Customers on an ongoing basis to assure that each Customer's business has not changed and that the Customers are using Prescreening Services only pursuant to FRCA section 604(c) and as allowed under this Agreement and the applicable PSA." (*Id.* ¶ 3.a.vi.)

In the Prescreening Services Agreement entered into by NameSeeker and Experian, NameSeeker "certifie[d] to Experian

---

3. Virtual Lending Source was initially a defendant in this lawsuit. (*See* First Compl. ¶ 4.) During the course of the litigation, however, it became clear to Plaintiff's counsel that Virtual Lending Source was not involved with the disputed flier. (*See* Pl.'s Opp'n Ex. L, Gluckman Aff.) Plaintiff's counsel accordingly dismissed all claims against Virtual Lending Source. *See* Docket Number 4.

4. This motion was filed on behalf of ChoicePoint, DMMI, and NameSeeker. ChoicePoint is the only defendant remaining in this litigation. Any reference to "defendants" in this opinion includes all three defendants prior to the dismissal of DMMI and NameSeeker.

that it will extend a firm offer of credit or firm offer of insurance ... to every Consumer" on the prescreened list delivered to NameSeeker. (Def.'s Mem. Supp. Renewed Mot. for Summ. J. ("Def.'s Mem.") Ex. 6 ¶ 4.D.) NameSeeker also entered into a Marketing Services Agreement with ChoicePoint in which both parties "represent that they shall comply in all respects with all applicable Federal, state and local laws, regulations and rules." (Def.'s Mem. Ex. 7 ¶ 7.)

In connection with its relationship with Experian, NameSeeker requested that any third party processors involved with NameSeeker's use of Experian's data (e.g., marketers and printers) enter into "third-party processor agreements" with Experian. (Def.'s Mem. 6.) In March 2005, DMMI and AccuData[5] entered into Prescreening Services and Account Monitoring Third–Party Processor Undertakings with Experian, which permitted Experian to provide lists or other data directly or indirectly to the third party processor in connection with the prescreening services provided by Experian to NameSeeker. (Def.'s Mem. Ex. 10, Ex. 11.) These agreements list NameSeeker as the client and state that the "Third Party Processor will not duplicate or compile any data contained in the Media[6] or provide the same in any form to any third party." (Def.'s Mem. Ex. 10, Ex. 11.) The agreement also prohibits the third party processor from

"us[ing] any information it obtains as a result of its handling, processing, or possession of the Media in connection with the creation, testing, promotion, marketing, selling and/or licensing of Third Party Processor's information, products or services," and directs the third party processor "to destroy the Media immediately upon completion of the Undertaking for which the Media was initially provided to Third Party Processor." (Def.'s Mem. Ex. 10, Ex. 11.)

On April 25, 2005, NameSeeker placed an order with ChoicePoint, and the prescreened list provided to NameSeeker by ChoicePoint included information from Plaintiff and other Maryland residents' consumer reports. (Def.'s Mem. 6.) This information was used in the creation and distribution of the Foreign Motors Suzuki flier received by Plaintiff. (Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mot.") 2–3.)

## II.

A motion for summary judgment will be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A material fact is one that may affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When cross-motions for summary judgment are submitted to a district court,

---

**5.** AccuData serves as an intermediary between DMMI and NameSeeker: "Periodically, DMMI contacts AccuData when one of DMMI's retailer clients decides to hold a promotional event and needs to identify potential customers that meet certain credit requirements. AccuData finds third parties who can assist DMMI in identifying" such potential customers for DMMI's clients. (Def.'s Mem. Ex. 14 ¶ 2.) DMMI provides the parameters to AccuData, which then generates results from NameSeeker's website. (*Id.* ¶ 4.) DMMI and its client decide how many names to purchase and then provide a sample flier to NameSeek-

er. (*Id.* ¶¶ 4–5.) AccuData has no role in the creation of the flier or verification of the authenticity of the lender identified on the flier. (*Id.* ¶ 5.) Following NameSeeker's approval of the proposed flier, AccuData helps finalize the transaction and NameSeeker provides the list of customers directly to DMMI. (*Id.* ¶¶ 7, 9.)

**6.** Media is defined earlier in the agreement as "any such list or other media provided directly or indirectly by Experian to Third Party Processor on behalf of Client." (Def.'s Mem. Ex. 10, Ex. 11.)

each motion must be considered individually, and the facts relevant to each must be viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir.2003).

### III.

### A.

Before turning to the pending motions, I will briefly describe the framework of the relevant provisions of the Fair Credit Reporting Act. The FCRA is "designed to preserve the consumer's privacy in the information maintained by consumer reporting agencies." *Cole v. U.S. Capital, Inc.*, 389 F.3d 719, 725 (7th Cir.2004). The FCRA achieves this design by imposing restrictions on access to individuals' credit information. In particular, a credit report can be accessed only for certain statutorily-enumerated "permissible purposes." 15 U.S.C. § 1681b(a). For example, a person's credit information can be accessed by another with the person's written consent. *Id.* § 1681b(a)(2). More relevant to the instant case, an individual's credit information can be accessed by another in conjunction with a "credit or insurance transaction" that "consists of a firm offer of credit or insurance...." *Id.* § 1681b(c)(1). The FCRA defines "firm offer of credit" as follows:

> The term 'firm offer of credit or insurance' means any offer of credit or insurance to a consumer that will be honored if the consumer is determined, based on information in a consumer report on the consumer, to meet the specific criteria used to select the consumer for the offer....

*Id.* § 1681a(*l*). In allowing for access to credit information for the extension of firm offers of credit, Congress sought to balance consumers' interest in privacy with consumers' interest in valuable offers of credit. *See Trans Union Corp. v. F.T.C.*, 267 F.3d 1138, 1143 (D.C.Cir.2001) ("Con-

gress apparently believes that people are more willing to reveal personal information in return for guaranteed offers of credit than for catalogs and sales pitches.").

The firm offer exception is intended to operate, more or less, as follows. A lender, seeking to pre-screen potential customers, will identify certain financial criteria bearing on an individual's creditworthiness. Then, the lender will request that a credit reporting agency compile a list of persons whose credit report shows that they meet those criteria. The credit reporting agency will sell the list to the lender, who will use the list to solicit consumers by extending firm offers of credit. *See, e.g., Kennedy v. Chase Manhattan Bank, USA*, 369 F.3d 833, 841 (5th Cir. 2004). These firm offers of credit often come in the form of advertisements or fliers offering pre-approved loans.

For an offer to be firm, the lender must be ready and willing to extend the promised line of credit. However, the offer can be conditioned on the fact that the consumer actually met, and "continues to meet[,] the specific criteria used to select the consumer for the offer" in the first place. 15 U.S.C. § 1681a(*l*)(2)(A). A lender can properly seek to verify that the consumer met the criteria at the time he or she was selected (i.e. that the credit reporting agency did not incorrectly include the consumer on the list) and that the consumer *continues* to meet the criteria at the time he or she seeks to accept the offer. Thus, once the consumer seeks to accept the offer, a lender can properly require access to the consumer's credit report for the purpose of verifying compliance with the pre-selected criteria. 15 U.S.C. § 1681a(*l*)(2)(A). Assuming original and continued compliance, the lender *must* provide the line of credit promised. *See* 15 U.S.C. § 1681 a(*l*) (defining firm offer of credit). Otherwise, the lender,

when purchasing the list from the credit reporting agency, has impermissibly accessed individual private credit information and will be liable under the FCRA. *See, e.g., Villagran v. Freeway Ford, Ltd.*, 525 F.Supp.2d 819, 821 (S.D.Tex.2007) (explaining that "[a] prospective creditor may purchase information about an individual's credit from a credit-reporting agency in order to prescreen the individual for creditworthiness based on preestablished eligibility criteria and to extend 'firm offers of credit' to an individual who meets the criteria," but not merely for advertising purposes).

### B.

Both parties have moved for summary judgment on Harris's FCRA Section 1681b claim against ChoicePoint. Section 1681b(a) provides that, subject to Section 1681b(c), a consumer reporting agency may only furnish a consumer report under six enumerated circumstances. Under one such circumstance, as relevant to this case, a consumer reporting agency may provide a report "[t]o a person which it has reason to believe ... intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer...." 15 U.S.C. § 1681b(a)(3)(A). Section 1681b(c), in turn, provides that:

A consumer reporting agency may furnish a consumer report relating to any consumer pursuant to subparagraph (A) or (C) of subsection (a)(3) of this section in connection with any credit or insurance transaction that is not initiated by the consumer only if—

(A) the consumer authorizes the agency to provide such report to such person; or

(B)(i) the transaction consists of a firm offer of credit or insurance;

(ii) the consumer reporting agency has complied with subsection (e) of this section;[7] and

(iii) there is not in effect an election by the consumer, made in accordance with subsection (e) of this section, to have the consumer's name and address excluded from lists of names provided by the agency pursuant to this paragraph.

15 U.S.C. § 1681b(c). Therefore, in this case, ChoicePoint must have "reason to believe" that the entity to whom it releases a consumer's report "intends to use the information in connection with" a "transaction consist[ing] of a firm offer of credit." 15 U.S.C. §§ 1681b(a); 1681b(c).

■ Harris argues that ChoicePoint violated Section 1681b by selling information from Harris's consumer report to NameSeeker, which NameSeeker did not use for transactions involving firm offers of credit. (Pl.'s Opp'n 2.) However, NameSeeker's ultimate use of Harris's information is not determinative of ChoicePoint's liability under the statute. Rather, under Section 1681b, ChoicePoint is only liable if it furnished the credit information to NameSeeker without "reason to believe" NameSeeker was accessing the information for a permissible purpose. *See Kennedy v. Victoria's Secret Stores, Inc.*, No. Civ. A. 03–2691, 2004 WL 414808, at *3, 2004 U.S. Dist. LEXIS 3261, at *8 (E.D.La. Mar. 3, 2004) (unpublished) ("Experian's potential liability has no relationship to whether VS fraudulently extended credit to plaintiff, but rather, hinges on whether Experian had reason to believe that VS intended to

---

7. "Subsection (e) of this section" refers to 15 U.S.C. § 1681b(e), entitled "Election of consumer to be excluded from lists." This is not to be confused with 15 U.S.C. § 1681e, discussed more fully in Part III.C of this opinion.

use the information in connection with a firm offer of credit."). In other words, "[i]f the consumer reporting agency has *reason to believe* that the user had a permissible purpose in obtaining the report, there is no FCRA violation." *Greenhouse v. TRW, Inc.,* Civ. A. 96–1495, 1998 WL 61037, at *2 (E.D.La. Feb. 13, 1998) (unpublished) (*citing Korotki v. Att'y Servs. Corp.,* 931 F.Supp. 1269, 1276 (D.Md.1996)) (emphasis added).

■■■ In interpreting Section 1681b, courts have found that a consumer reporting agency had "reason to believe" that consumer reports were being accessed for a permissible purpose when the subscriber had certified such limited usage, the primary purpose of the subscriber's business involved accessing reports for a permissible purpose, and the agency was unaware of any impermissible use by the subscriber. *See, e.g., Wilson v. Sessoms,* Civil No. 4:96CV01031, 1998 U.S. Dist. LEXIS 8154, at *12–13 (M.D.N.C. Mar. 16, 1998) (unpublished) (granting summary judgment in favor of consumer reporting agency where subscriber had certified that it would access consumer reports for permissible purposes, subscriber's primary business (skiptracing) involved accessing reports for permissible purposes, and there was no showing that the consumer reporting agency had notice of subscriber's improper purpose for accessing plaintiff's report); *Boothe v. TRW Credit Data,* 557 F.Supp. 66, 71 (S.D.N.Y.1982) (finding that "Fidelifacts' primary business purpose [employment] and its certification to TRW constituted sufficient 'reason to believe' on the part of TRW that Fidelifacts had a legitimate business need for the report requested"); *Klapper v. Shapiro,* 154 Misc.2d 459, 586 N.Y.S.2d 846, 850 (N.Y.Sup.Ct.1992) (finding that credit reporting agency had "reason to believe" credit information was being accessed for permissible purposes based on subscriber's certification and business purpose and stating: "That TRW

issued the report in response to a seemingly legitimate request is insufficient to impose liability on TRW for an unauthorized and improper request by an otherwise legitimate subscriber who certified that credit reports would only be obtained for permissible purposes. Rather, it is the user of the consumer credit profile report who is cast in liability for obtaining the report under false pretenses and using it for an impermissible purpose."). Under this analysis, it is clear that ChoicePoint had "reason to believe" that NameSeeker intended to use Plaintiff's information for a permissible purpose.

ChoicePoint points to several certifications that created a "reason to believe" NameSeeker would use the information for a permissible purpose. NameSeeker certified in its membership agreement with Experian that it would extend firm offers to every consumer whose name appeared on prescreened lists NameSeeker obtained from ChoicePoint. (Def.'s Mem. Ex. 6 ¶ 4.D.) In NameSeeker's Marketing Services Agreement with ChoicePoint, NameSeeker certified that its usage would "comply in all respects with all applicable Federal, state and local laws, regulations and rules." (Def.'s Mem. Ex. 7 ¶ 7.) While ChoicePoint contends that NameSeeker's certifications alone created a "reason to believe," ChoicePoint claims that it had further reason to believe the data would be used for a permissible purpose based on the certifications provided in DMMI and AccuData's Third Party Processor Agreements with Experian. (Def.'s Mem. 20.)

In addition to the certifications, NameSeeker's legitimate business purpose further supports ChoicePoint's argument that it had reason to believe NameSeeker was accessing credit information for a permissible purpose. It is clear that NameSeeker's business purpose does not involve the

direct extension of firm offers of credit to consumers, but that NameSeeker acted instead as a middleman that ChoicePoint reasonably believed was reselling information to entities making firm offers of credit.[8] (Pl.'s Opp'n Ex. M, Lawya Dep. 27:25; 31:20–24, June 30, 2008; Pl.'s Opp'n Ex. E.) NameSeeker describes itself as "a leading provider of information about people and businesses" (Pl.'s Opp'n Ex. S) and states that it "will provide lists of ... Experian ... prescreened individuals for use of" its customers on the condition that direct mail solicitations "must be a firm offer of credit."[9] (Pl.'s Opp'n Ex. E.) This business purpose gave ChoicePoint "reason to believe," as required under Section 1681b, that NameSeeker "intend[ed] to use the information in connection with" a "transaction consist[ing] of a firm offer of credit." 15 U.S.C. § 1681b.

Harris claims, however, that despite the certifications or appearance of a legitimate business purpose of NameSeeker, ChoicePoint was on notice of NameSeeker's improper purpose for accessing Harris's reports. Harris bases his notice argument on an email sent from an Experian executive to a ChoicePoint executive on March 17, 2005. The email states, in part:

> You and I need to have a discussion about NameSeeker. I've had something brought to my attention that leads me to believe NameSeeker has extended the permissible use under the Agency Agreement further than Experian allows. If you and I cannot resolve this situation Experian will audit NameSeeker per our Prescreen Services Agreement's Rights.
>
> The attached contract was presented to a third party by Accudata. It doesn't seem right that Accudata would be sending this agreement out and especially with the customer as NameSeeker. The title of the agreement worries me. Also, if you look at the document properties the company name is Equifax. This all doesn't add up. I need your help in getting to the bottom of this. We need to get something documented that will satisfy or legal and risk and regulatory compliance.
>
> The chain is as follows
>
> 1) ChoicePoint
>
> 2) NameSeeker
>
> 3) Accudata—Provided this contract to party #4 and would be paid for list
>
> 4) Processor
>
> 5) End User—Grantor of Credit
>
> The last thing I have is an email that appears to be from NameSeeker approving the mail piece language.
>
> This may not be happening as stated. There are circumstances that do indicate misuse but unverified by me or Experian.

(Pl.'s Opp'n Ex. O.)

ChoicePoint claims that, despite this email, it was not on notice that NameSeek-

---

**8.** The deposition testimony of ChoicePoint executive Martina Roth indicates that ChoicePoint and Experian's policies require the party with whom ChoicePoint enters into an agreement to act as the lender extending firm offers of credit. (Pl.'s Opp'n Ex. D, Roth Dep. 211:11–212:3, June 25, 2008.) As ChoicePoint entered into an agreement with NameSeeker, it would follow from this policy that NameSeeker was the lender directly extending firm offers of credit. However, the evidence is clear that NameSeeker was not a lender, but that NameSeeker's business purpose involved accessing of credit information for its customers, who were required by NameSeeker's policies and licensing agreements to extend firm offers of credit as required by the FCRA. (See Pl.'s Opp'n Ex. E.)

**9.** NameSeeker also includes the following conditions: the lists are limited to a one-time single purpose use; all solicitation forms are subject to compliance approval; a disclaimer provided by NameSeeker must be included on automotive solicitations involving credit data. (Pl.'s Opp'n Ex. E.)

er was accessing credit information for an impermissible purpose. As ChoicePoint notes, the email does not state that Name-Seeker is misusing the information, but instead requests ChoicePoint's assistance in determining whether or not such misuse is occurring. Additionally, shortly after this email was sent, NameSeeker obtained the Prescreening Services and Account Monitoring Third Party Processing Undertakings from AccuData and DMMI, which governed and limited the use of Experian data by these parties, addressing, at least in part, any concerns raised by the email. (*See* Def.'s Mem. Ex. 10, Ex. 11.) Choice-Point also notes that the April 25, 2005 order involving Plaintiff's credit information was made "in the context of a series of contracts and undertakings" which gave ChoicePoint reason to believe NameSeeker's purpose for requesting credit reports was permissible. (Def.'s Mem. 19.)

The Experian email, when considered in light of the subsequent DMMI and Accu-Data agreements, does not constitute sufficient evidence to create a genuine issue of material fact as to ChoicePoint's "reason to believe." I therefore find, based on NameSeeker's certification, NameSeeker's primary business purpose involving the accessing of consumer credit reports for a permissible purpose, and the absence of credible red flags, that ChoicePoint had the statutorily required "reason to believe" NameSeeker was accessing the information permissibly.[10] Accordingly, Choice-Point's renewed motion for summary judgment on Harris's Section 1681b claim is granted and Harris's corresponding motion is denied.

### C.

■ Harris also alleges that Choice-Point has violated FCRA Sections 1681e(a) and 1681e(e), which require consumer reporting agencies and resellers, respectively, to follow reasonable procedures to ensure that reports are being furnished for permissible purposes under Section 1681b. However, "a plaintiff bringing a claim that a reporting agency violated the 'reasonable procedures' requirement of § 1681e must first show that the reporting agency released the report in violation of § 1681b." *Washington v. CSC Credit Servs. Inc.*, 199 F.3d 263, 267 (5th Cir.2000); *Kennedy*, 2004 WL 414808, at *3, 2004 U.S. Dist. LEXIS 3261, at *10 ("Since the court has determined that Experian did not violate § 1681b, Plaintiff's claims that Experian failed to maintain reasonable procedures to avoid issuing credit reports for other than a permissible purpose must be dismissed."); *cf. Dalton v. Capital Associated Indus.*, 257 F.3d 409, 415 (4th Cir.2001) ("To make out a violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information.") (internal quotations omitted). In addressing the "reasonable procedures" provision found in Section 1681e(a), the court in *Washington* looked to case law interpreting Section 1681e(b), which also has a 'reasonable procedures' provision: "This reading finds

---

**10.** Despite being provided ample opportunity to conduct further discovery, Plaintiff has failed to uncover any invidious relationship between ChoicePoint and NameSeeker. However, the series of indirect and interlocking relationships present in this case seems to extend beyond what Congress envisioned when it enacted the FCRA. That ChoicePoint, a reseller, sold information to another reseller, NameSeeker, rather than to the entity making the firm offer of credit, makes this case difficult to fit within the statutory framework. While this may be a proper subject of legislative inquiry, I do not read the statute as requiring a direct relationship between the consumer reporting agency or reseller and the lender.

support in cases interpreting a related part of § 1681 e.... Courts applying § 1681 e(b) uniformly limit recovery to cases where the failure to follow procedures causes actual harm (*i.e.,* release of an inaccurate report) to the consumer." 199 F.3d at 267 n. 3. I find the reasoning in *Washington* equally applicable in the context of the "reasonable procedures" provision of Section 1681e(e). As I have found no violation of 1681b by ChoicePoint, I need not evaluate the reasonableness of ChoicePoint's procedures under Section 1681e. Accordingly, ChoicePoint's renewed motion for summary judgment on Plaintiff's FCRA Section 1681e claims is granted and Plaintiff's opposing motion on these claims is denied.

A separate order effecting the rulings made in this opinion is being entered herewith.

### ORDER

For the reasons stated in the accompanying Memorandum, it is, this 23rd day of April, 2009,

ORDERED:

1. ChoicePoint's motion for summary judgment is granted;

2. Plaintiff's motion for partial summary judgment is denied; and

3. Judgment is entered in favor of ChoicePoint.